In re MARRIAGE OF NANCEE KAY JOHNSON, Petitioner-Appellee, and GORDIAN GLENN JOHNSON, Respondent-Appellant.

Fifth District    No. 81-65

Opinion filed September 30, 1981.

Sorling, Northrup, Hanna, Cullen and Cochran, Ltd., of Springfield (Elizabeth A. Evans and A. Clay Cox, of counsel), for appellant.

Hal Alexander, of Taylorville, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

Following a bench trial in the circuit court of Christian County, petitioner, Nancee Kay Johnson (wife), was granted a dissolution of marriage from respondent, Gordian Glenn Johnson (husband). Husband appeals only that portion of the order which requires that his visitations with the parties' minor child be supervised.

The parties were married on June 5, 1976, and one child was born of the marriage, a son who was born on October 31, 1976. On April 25, 1980, the wife filed a petition for dissolution of marriage which alleged that the husband had been guilty of extreme and repeated acts of physical and mental cruelty.

At trial it was undisputed that during the course of the marriage the husband had repeatedly taken and misused several types of drugs, including some drugs prescribed by his physician. The husband's use of drugs increased with marital, financial and academic difficulties, and after the parties had separated this misuse culminated in several voluntary

overdoses of valium, which had been prescribed for him by a physician. Husband testified that in the two months preceding the hearing he had ceased all improper use of drugs and had taken a substantial step toward full recovery. At the time of the hearing it was undisputed that the husband, who had an associate's degree in psychology, was employed as an activity therapist at the Springfield Mental Health Center. In that capacity the husband was working with chronic schizophrenics and depressives and was receiving $3.50 per hour for a 40-hour work week. It was also undisputed that the husband himself had been receiving therapy from Dr. Patrick Brophy, a certified psychologist with both clinical and teaching experience.

Dr. Brophy testified on the husband's behalf, stating that prior to the hearing he had seen the husband on 11 occasions, averaging approximately one hour per visit. Brophy stated that the husband was starting to drop some of his adolescent habits, including "the recreational use of drugs." Brophy concluded that the son would not be endangered by the husband's unsupervised visitation. Brophy admitted that in making his prognosis he had not been informed of the extent to which the husband had previously used drugs; however, he stated that such information would be unlikely to change his prognosis.

In contrast to Brophy's testimony, the wife offered the testimony of the husband's adoptive father, Alfred Westrick. Westrick stated that he had taken over custody of the husband when he had been orphaned at age 15. He had maintained a close relationship with the husband, and he detailed some of the problems the husband had had with drug overdoses. Although Westrick admitted that he was not aware of the husband's current emotional outlook, it was his opinion that the husband should not be allowed unsupervised visitation at that time. Westrick stated that he was more fearful of neglect by the husband than of any intentional abuse.

In addition to the evidence concerning the husband's experience with drugs, there was extensive evidence concerning the husband's violent nature and suicidal tendencies. Although the husband denied virtually all of the wife's allegations, the wife testified at length concerning the many times the husband had threatened to take not only his own life but that of his wife and child. According to the wife, the husband was holding firearms when several of the threats were made. The wife also testified about the many times she had been physically abused by the husband. She stated that when she was eight months pregnant the husband had kicked her causing her to fall out of bed. She also told of one incident in which he had grabbed her by the hair and had begun throwing her head against the wall, then threw her to the floor and began choking her. She stated that much of her body had been bruised as a result of that incident and that it took several weeks for some torn ligaments to heal. The wife also testified

that shortly after the separation she had tried to keep the husband from being alone with their son, but the husband responded by chasing her out of the house. According to the wife, the husband not only hit her as he chased her but also threw a lamp at her. The wife stated that she had run to a neighbor's house, only to have the husband knock her against the door of that home. The neighbor also testified to having seen the husband hit the wife, but the husband claimed otherwise, stating that he had slapped his wife and then chased her to the neighbor's home. He denied striking her in front of the neighbor's home. The wife also detailed how the husband had spanked their son at least weekly even though the child was well behaved.

Following the presentation of this evidence the court addressed the husband, stating:

> "There isn't any basis here that, that you are the stable person that should have a child to take care of during this time. There's a further evidence of suicidal tendencies * * *. Now as I said to you, perhaps it is coming, maybe you are being stabilized but the evidence certainly doesn't show it at this time. And for this reason I would not allow unsupervised visitation."

The court ordered all visitation to be supervised for six months and that at the end of that time the order would be reviewed. The husband appeals.

On appeal the husband correctly points to a series of cases in which it has been stated that Illinois law favors liberal visitation. (*Frail v. Frail* (1977), 54 Ill. App. 3d 1013, 370 N.E.2d 303; *Hock v. Hock* (1977), 50 Ill. App. 3d 583, 365 N.E.2d 1025; *Blazina v. Blazina* (1976), 42 Ill. App. 3d 159, 356 N.E.2d 164; *McManus v. McManus* (1976), 38 Ill. App. 3d 645, 348 N.E.2d 507.) The husband contends that the trial court failed to comply with this policy only because of his limited financial support of the child and because of his previous conduct. The husband contends that rather than fearing that he posed any present danger to the child, the court was merely motivated by a desire to punish him for his past misconduct. Although such motivation is highly improper and would provide a basis for reversal (*Hock*; *In re Marriage of Lawver* (1980), 82 Ill. App. 3d 198, 402 N.E.2d 430), we are convinced that it did not occur here. The record demonstrates that the court was concerned with the child's welfare, a concern prompted by its findings concerning the husband's aggressive behavior and suicidal tendencies. Despite the testimony of Dr. Brophy, we are convinced that the findings made by the trial court in this case are fully supported by the evidence.

■■ It has long been recognized that the disposition of matters of child custody and support rest largely in the discretion of the trial court (*Rodely v. Rodely* (1963), 28 Ill. 2d 347, 192 N.E.2d 347), and findings on these issues will not be disturbed unless they are against the manifest weight of

the evidence. (*Doggett v. Doggett* (1977), 51 Ill. App. 3d 868, 366 N.E.2d 985.) The trial court's statements showed that it discounted Dr. Brophy's testimony because of his unfamiliarity with the full extent of the husband's prior drug problems. The court's statements also show that it was heavily influenced by the fact that even the husband's adoptive father would not recommend that the husband have unrestricted visitation. Since the testimony of the husband's adoptive father evidenced a close relationship with the husband, the trial court was merely confronted with a difference of opinion by two knowledgeable witnesses. We cannot conclude that the trial court's resolution of the conflicting testimony was against the manifest weight of the evidence. Similarly, we cannot conclude that the trial court placed undue emphasis upon the husband's past conduct while failing to consider the husband's current emotional outlook. Admittedly, in determining the best interests of the child the court should consider the most recent evidence of parental fitness. The husband contends that the trial court failed to do this because it all but ignored Dr. Brophy's testimony. We cannot agree. The record demonstrates that the trial court carefully considered Brophy's testimony by concluding that although there was evidence of some progress, the court was not convinced that enough progress had been shown. It was undisputed that any progress the husband might have achieved through psychological counseling progress had come about only in the two months preceding the hearing. As a result, the court considered this fact in the context of the behavior the husband had exhibited over the past several years.

■■ On the facts of this case we believe that the trial court could properly find that the husband posed a danger to the child. Nonetheless, the trial court demonstrated concern for the Illinois policy for liberal visitation by ruling that the order requiring supervised visitations would be reviewed in six months. The court was attempting to give the father an opportunity to rehabilitate himself in a relatively short time. We see no error in the trial court's ruling.

The husband's final contention is that the trial court failed to comply with section 607 of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 607), which provides:

"(a) A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral or emotional health. If the custodian's street address is not identified, pursuant to Section 708, the court shall require the parties to identify reasonable alternative arrangements for visitation by a non-custodial parent, including but not limited to visitation of the minor child at the residence of another person or at a local public or private facility.

(b) The court may modify an order granting or denying visitation rights whenever modification would serve the best interest of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional health."

The husband contends that this section requires a formalistic recital by the trial court, and the recital was not in the court's order. In support of this position the husband cites to *Lawver* and *Crichton v. Crichton* (1979), 75 Ill. App. 3d 326, 393 N.E.2d 1319. However, neither of those cases called for a formalistic recital that section 607 had been complied with. Those two cases merely held that before visitation rights could be restricted it would be necessary for the court to find a danger was posed to the child. That standard was fulfilled in this case. Despite the absence of a formalistic recital, the trial court's reasoning for restriction of visitation rights is undeniably and explicitly set forth in the record, and those findings are supported by the evidence. As this court has recently held, when a statute requires a finding to be made in the record, it is for the purpose of permitting the appellate court to review the reasoning of the trial court. (*People v. Pittman* (1981), 100 Ill. App. 3d 838, 427 N.E.2d 276.) That purpose was fulfilled here, and a formalistic recital was not required.

For the reasons stated we affirm.

Affirmed.

KASSERMAN, P. J., and KARNS, J., concur.