*In re* MARRIAGE OF RONALD L. CARPEL, Petitioner-Appellee, and SUSAN K. CARPEL, n/k/a Susan K. Kolinger, Respondent-Appellant.

Fourth District No. 4—91—0268

Opinion filed July 30, 1992.—Rehearing denied August 31, 1992.

Michael B. Metnick and Diana Cherry, both of Metnick, Barewin & Wise, of Springfield, for appellant.

Robert G. Heckenkamp, of Heckenkamp, Simhauser & LaBarre, P.C., of Springfield, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In May 1986, the trial court entered a judgment of dissolution of the marriage of petitioner, Ronald Carpel, and respondent, Susan Carpel (now Kolinger). Since that date, Susan and Ronald have both filed numerous petitions to amend or modify that judgment. In April 1991, the trial court entered an order modifying the judgment of dissolution by increasing Ronald's child support payments, but also allowing Ronald longer, uninterrupted visitation with Russell, the parties' son. The court also fined Susan $1,000 for contempt of court, denied her request for extended maintenance, denied her request for attorney fees and other miscellaneous relief, and reaffirmed its order for Ronald's accounting for Susan's share of his attorney fees.

Susan appeals, arguing that the trial court (1) improperly set Ronald's child support too low, (2) incorrectly calculated her share of fees from Ronald's former legal practice in Decatur, (3) erroneously found her in contempt of court, (4) improperly denied her request for continued maintenance, (5) erroneously excluded evidence of her lifestyle during their marriage, (6) erroneously lifted the requirement that Ronald provide her with a copy of his tax returns, (7) erroneously denied her petition for attorney fees, and (8) improperly denied her visitation during the summer months when Russell stays with Ronald.

We affirm in part, reverse in part, and remand with directions.

## I. BACKGROUND

Ronald and Susan married in 1969 in Florida. They were living in Decatur, Illinois, when, after 17 years of marriage, their marriage ended in 1986. Ronald, a 46-year-old attorney, moved back to

Florida just before the 1986 judgment of dissolution. In that judgment, the court awarded Susan, a 45-year-old homemaker, custody of their three children: Leslie, born in August 1970; Ryan, born in February 1973; and Russell, born in January 1981. The court awarded Ronald visitation rights with the children over school breaks as follows: one week during winter break, the entirety of their spring break, and six weeks during their summer break. The court ordered Susan to choose the Christmas visitation week in even-numbered years and Ronald to choose the Christmas visitation week in odd-numbered years, with the selecting parent notifying the other by the first of October preceding the vacation period. Conversely, Ronald would choose the summer visitation period in even-numbered years and Susan would choose in odd-numbered years. The court ordered Ronald to pay the children's travel expenses.

The court expressly found that "rehabilitative maintenance to [Susan] is appropriate and proper" and awarded Susan $750 per month in maintenance for four years and ordered Ronald to pay $250 per month per child in child support. Upon Susan's remarriage or the end of the four-year period, the court ordered that Susan's maintenance would cease and the child support would increase to $375 per month per child. The court specifically stated that "[t]his maintenance and support award is based upon Mr. Carpel's present income status," but did not indicate whether the court retained jurisdiction to modify the maintenance or support award at the end of or during the maintenance period. Ronald was also ordered to provide health insurance for the minor children.

The court awarded Susan the marital residence in Decatur, some vacant land in Hickory Point Estates, $25,000 from Ronald's pension fund, all the household furniture, her jewelry, crystal, art work, a grand piano, a mink coat, and a Buick station wagon. The court awarded Ronald a Cadillac, a Dodge Van, the full ownership interest in a certificate of deposit held by his disbanded Decatur law firm, the entire interest in certain oil investments, a $37,000 promissory note due him, certain stocks the court described as non-marital property, all his clothes, his jewelry, a silver service, and some other personal items. The court evenly divided the parties' municipal bonds, their 1984 joint income-tax refund, and their interest in a real estate partnership known as Meadowridge Partnership. The court also ordered Ronald to pay all indebtedness of the parties incurred while married, including Susan's attorney fees.

Finally, the court awarded Susan 30% of Ronald's interest in pending cases he referred to other law firms when he moved to Florida and 50% of Ronald's contingent fee from a million-dollar judgment affirmed in *Lancaster v. Norfolk & Western Ry. Co.* (7th Cir. 1985), 773 F.2d 807, which was pending on appeal at the time of the 1986 judgment of dissolution. Ronald submitted a sealed list of the cases he referred to other firms, and the court ordered him to provide Susan with an accounting of them every six months. The court concluded its order by "expressly retain[ing] jurisdiction of this cause for the purpose of enforcing all the terms of this [j]udgment of [d]issolution of [m]arriage."

In November 1987, Susan filed a petition for modification, alleging that Ronald had testified that his 1986 income was about $50,000, when it actually was $208,443. (Ronald reported his gross income as $155,852 on his 1986 income-tax form.) In December 1987, Ronald filed his own petition for modification as well as a response to Susan's petition, claiming that he had incurred substantial debt when he opened his own law practice and could neither afford an increase in support and maintenance, nor continue to pay the then-existing support and maintenance awards. In January 1988, Ronald filed a motion requesting the court to reduce those awards retroactively if the court were to grant his petition to reduce them.

Although the trial court set a hearing on these petitions for February 19, 1988, no docket entry appears for this date, and the trial court entered no written order or memo. Thus, although it appears that the parties settled this particular dispute out of court, the record contains no documentation of such a settlement.

In July 1988, Ronald filed another petition for modification, requesting the court to order custody of Ryan transferred to Ronald. The petition alleged that turmoil in Susan's home, her general instability, and her interference with Ronald's relations with the children had upset Ryan tremendously, making him want to live with his father. Later that month, Ronald filed a motion to terminate child support for Leslie, who would turn 18 in August 1988. In response, Susan filed a petition to modify the judgment of dissolution that basically restated the allegations in her November 1987 petition for modification. Susan also filed a petition to enforce the judgment of dissolution, claiming that Ronald had incorrectly calculated the taxes due on the fees he earned from cases he referred to other law firms, thereby causing Susan to receive less than her share of those fees.

In August 1988, the court conducted a hearing on this round of petitions and motions and awarded temporary custody of Ryan to Ronald. The court also appointed a guardian *ad litem* for both Russell and Ryan. At this hearing, Ronald filed a petition for rule to show cause, requesting the court to find Susan in indirect contempt of court for not using her best efforts to foster the respect, love, and affection of the children for him as required by the judgment of dissolution. The record does not indicate that the court ever ruled on this petition. In September 1988, before the full hearing on custody of Ryan, Ronald filed an additional petition that requested the court to award custody of Russell to Ronald if it also awarded him custody of Ryan.

In November 1988, the trial court issued a memorandum opinion requiring Ronald to pay for Leslie's college education. The court based its order on the cost of attending a State university ($7,726 plus expenses), not on the cost of attending the private school Leslie actually attended ($9,500 plus expenses) because Ronald was not consulted before Leslie and Susan chose a private school. The court then set Ronald's obligation at $5,794.50 for the remaining 1988-89 school year and $7,726 for the following three years.

In December 1988, Ronald filed a motion for rehearing on his obligation to pay Leslie's college expenses, alleging that he had incurred an additional $20,000 in debt from his law practice and developed a cardiac condition ("left ventricular hypertrophy and mitral regurgitation") that caused hypertension and forced him to reduce his workload. The docket sheet shows no action on this motion or on other pending petitions until June 1989, when *Leslie* (then 18 years old) filed a petition to recover property from Susan. This petition was notarized in Florida and drafted in perfect form without any attorney of record shown thereon. Ronald concurrently filed a petition for the return of property, requesting that, in addition to the property listed in Leslie's petition, the court also order Susan to return Leslie's mouth retainer to her. Apparently, this round of petitions arose when—according to a September 1989 filing by Ronald—Susan had chastised Leslie for wanting to visit her father and tried to prevent her from doing so. In June 1989, Leslie allegedly had to sneak out of Susan's house without her belongings in order to travel to Florida.

In July 1989, after a hearing on the custody of the children, the court ordered Russell and Ryan to stay with Ronald from July 7 to August 16, whereupon they would return to Decatur. Ryan would then stay with his mother until September 5, when he would return

to Florida for school. In August 1989, the court ordered that Leslie, accompanied by a friend, could recover her property (presumably including the mouth retainer) from Susan's house.

In August 1989, Ronald filed another petition requesting the court to transfer custody of Russell to Ronald, this time claiming "[t]hat Susan *** is not emotionally fit nor proper to have the care, custody or control of Russell Carpel."

In September 1989, without taking action on Ronald's August petition, the court set Ryan and Russell's visitation schedule for winter and summer 1990 similar to the 1989 summer visitation order, such that Ryan would travel to Illinois for a visit, Russell would travel with Ryan back to Florida to visit with his father, and then Russell, alone, would return to Illinois. The roles and order of locations would reverse for summer visitation.

Susan filed a wave of petitions in September 1989. The first, a petition for accounting, claimed that Ronald had again not paid her the share she was due on fees he received for cases he referred to other firms. The second and third petitions requested the court to increase child support and to continue and increase the maintenance award that would expire in February 1990 (the end of the four-year period set in the original judgment of dissolution). In both petitions, she noted that she had spent a great deal of money on attorney fees and could no longer adequately support herself or her children.

In October 1989, Ronald filed a response to the petition to increase child support, a motion to strike the petition for accounting, and a motion to strike the petition to modify maintenance. Ronald also filed a petition for rule to show cause why the court should not hold Susan in contempt for refusing to pay Leslie's expenses, as previously ordered, and a petition for child support for Ryan, now that he lived with Ronald.

In December 1989, before the court had ruled on Ronald's petition to transfer custody of Russell, Susan filed her own petition to transfer custody of Ryan back to her. The petition alleged that Ryan had changed his mind about wanting to live with Ronald in Miami and wanted to move back to Decatur.

At a hearing in January 1990, the court ordered that the maintenance of $750 per month and the child support of $250 per month per child contained in the original judgment of dissolution would continue through February 1990 (the end of the original four-year maintenance period), whereupon Ronald would pay $625 per month per child in support. The court labeled this order an "interim order," thereby continuing the maintenance and support issues indefi-

nitely into the future. The court also ordered the family to undergo medical and psychological examinations.

In May 1990, both Susan and Ronald filed petitions for rule to show cause. Susan claimed that the court should hold Ronald in contempt for failing or refusing to pay for and undergo the psychological examination the court ordered. She also requested the court to allow her unhindered phone calls and visitation with Russell when he lived with Ronald in Florida during the summer of 1990. In his petition, Ronald claimed—half a year after the fact—that the court should hold Susan in contempt for not getting Russell on the plane on time for his Christmas 1989 visit.

Later in May 1990, Susan withdrew her contempt petition when the court ordered that Ronald undergo a psychological examination on June 15, 1990. Based on a stipulation by the parties, the court also awarded custody of Ryan back to Susan. Finally, the court specifically denied Susan visitation for the time when Russell visits Ronald in Florida but allowed her two phone calls per week.

On separate dates in July, August, and November of 1990, the court held further hearings on Susan's petition for accounting for her share of Ronald's referral fees (including the fees on the *Lancaster* case). The court also held hearings on Susan's petition for maintenance and additional support that the court had addressed in an interim order and continued in January 1990.

With regard to the issue of Susan's share of the referral fees, Susan's expert testified that after subtracting income taxes on the referral fees, Ronald owed Susan either $32,628.75 (based on a "pro-rata" method that divides the fee collected by the tax rate used by Ronald for that year) or $30,335.94 (based on the "highest rate" method that takes the fee collected, subtracts it from the actual tax return, recalculates the tax without the fee, and then subtracts the difference in taxes from the fee). More than two-thirds of both figures represent the fee from the *Lancaster* case—in which the United States Supreme Court denied *certiorari* in March 1989 (*Norfolk & Western Ry. Co. v. Lancaster* (1987), 480 U.S. 945, 94 L. Ed. 2d 788, 107 S. Ct. 1602)—and for which Ronald received a $233,333 fee. The figures included interest of 8% annually on the unpaid amounts.

Susan testified that the Decatur residence awarded to her burned down after the divorce. After it was rebuilt, she had to sell it because she could not afford the mortgage payments. She had since rented a duplex. She had not found full-time work because of

her limited skills and because of her knee problems. She conceded that her knees ached because she did aerobics twice a day.

Russell, Ryan, and Leslie all testified *in camera*. Russell testified primarily about his preference on visitation and about how the bitterness between his parents affected him. Ryan testified primarily to show the court how Ronald and Susan have used him as a weapon to hurt each other and to alert the court that they might do the same thing with Russell. Leslie's testimony corroborated Ryan's and discussed Susan's current lifestyle and knee problems, basically supporting Susan's testimony.

The trial court took the matter under advisement and issued a memorandum decision in March 1991 and an order of modification in April 1991. In that order, the court increased Ronald's child support obligation to $1,400 until July 1991, when Ryan would graduate from high school. The court directed that child support would be $1,100 monthly after July 1991. The court also denied Susan's request for further maintenance, allowed Ronald increased visitation with Russell for two uninterrupted months each summer, found Susan in contempt and fined her $1,000, and ordered Ronald to pay the outstanding amount on Susan's share of the referral fees minus the $1,000 contempt fine and other expenses. Susan appeals this order.

## II. Analysis

### A. *Child Support*

#### 1. The Standard of Review

Under sections 505 and 510 of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1991, ch. 40, pars. 505, 510), the trial court has discretion to set and modify child support as it deems appropriate. (*In re Marriage of Harmon* (1991), 210 Ill. App. 3d 92, 96, 568 N.E.2d 948, 951.) We will not disturb any child support award or modification unless the trial court has abused its discretion. (See *Blisset v. Blisset* (1988), 123 Ill. 2d 161, 167, 526 N.E.2d 125, 127-28.) An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. *In re Marriage of Partney* (1991), 212 Ill. App. 3d 586, 590, 571 N.E.2d 266, 269.

#### 2. The Award for Future Support

Susan first argues that the trial court erred in setting the amount of child support that Ronald must pay. Section 505(a) of the Act requires the trial court to set the minimum amount of child support for one child

at 20% of the supporting parent's net income and at 25% of the supporting parent's net income for two children, unless the court finds a reason to deviate from these percentages. (Ill. Rev. Stat. 1991, ch. 40, par. 505(a).) Section 505(a)(3) defines net income as gross income minus the following: Federal and State income tax, social security payments, mandatory retirement contributions, union dues, dependent and individual health care insurance premiums, prior support or maintenance obligations, debt repayments reasonable and necessary to produce income, medical expenses necessary to preserve life or health, and other reasonable expenditures for the benefit of the child and other parent, exclusive of gifts. Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(3); see also *Carnes v. Dressen* (1991), 215 Ill. App. 3d 166, 169-70, 574 N.E.2d 845, 847.

In its memorandum opinion modifying Ronald's child support payments, the court explained the following:

"[G]iven the variable nature of [Ronald's] professional income, \*\*\* taking an average of his income over the years since entry of the [original] Judgment is the only equitable method for establishing income for purposes of calculating child support. It would not be fair to [Ronald] to base child support on a high income year anymore than it would be fair to [Susan] to base child support on a low income year."

After setting the above amounts of child support, the court added the following as a separate, concluding paragraph:

"The Court notes that the amount of child support ordered is above the guidelines, particularly when the medical expense obligation imposed on Plaintiff [in a separate section of the order] is added."

The evidence before the trial court revealed that Ronald earned far more than the trial court attributed to him. Although the court did not state what it found Ronald's average income "over the years" to be, we can use the statutory rates and the support the court ordered to calculate what the trial court must have estimated Ronald's income to be. Child support of $1,400 per month represents 25% of a $67,200 annual net income; $1,100 per month represents 20% of a $66,000 annual net income. No evidence in this record supports these figures as Ronald's anticipated annual net income. Thus, the trial court apparently did not first calculate Ronald's net income (as defined in section 505(a) of the Act) and then calculate 25% and 20% of that figure. Indeed, not only did the trial court not state how or what it determined Ronald's income "over the years" to be, it also did not state what years it counted or whether it believed any particular year reasonably forecasted Ronald's future income.

In stark contrast to these $67,200 and $66,000 figures, Ronald's tax returns indicate that he earned the following annual gross incomes since 1986:

| | | |
|---|---|---|
| 1986: | $155,852 | |
| 1987: | $171,851 | |
| 1988: | $ 28,156 | |
| 1989: | $328,496 | |
| 1990: | $ 3,434 | (first 10 months estimated) |
| Average since 1986: | $137,695 | |
| Average since 1987: | $133,155 | |
| Average since 1988: | $120,257 | |
| 1989 & 1990: | $166,308 | |

(We note that the income of $3,434 that Ronald estimated for the first 10 months of 1990 is well below the $328,496 income from 1989, and most likely does not reflect his actual 1990 income. We also note that the estimate did not come from an affidavit or testimony, but from a statement by Ronald's accountant that contained the following disclaimer in capital letters: "WE HAVE NOT AUDITED OR RECEIVED THE ACCOMPANYING FINANCIAL STATEMENTS AND SUPPORTING SCHEDULES AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE ON THEM.")

Allowing Ronald the deductions set forth in section 505(a)(3) of the Act, the evidence presented at trial shows he earned approximately the following net income in 1986 and the years since:

| 1986: | $155,852 | (gross income) |
|---|---|---|
| | - $ 48,562 | (Federal income tax) |
| | - $ 3,003 | (SSI) |
| | - $ 7,500 | (maintenance) |
| | - $ 3,820 | (child medical and transport) |
| | - $ 9,000 | (child support) |
| | $ 83,967 | |

| 1987: | $171,851 | (gross income) |
|---|---|---|
| | - $ 55,955 | (Federal income tax) |
| | - $ 9,000 | (maintenance) |
| | - $ 3,485 | (child medical and transport) |
| | - $ 9,000 | (child support) |
| | $ 94,411 | |

1988: $ 28,156 (gross income)
 - $ 5,576 (Federal income tax)
 - $ 9,000 (maintenance)
 - $ 4,243 (child medical and transport)
 - $ 9,000 (child support—estimated
 because of Leslie's college)
 _____
 $ 337

1989: $328,496 (gross income)
 - $ 84,308 (Federal income tax)
 - $ 9,000 (maintenance)
 - $ 6,326 (child medical and transport)
 - $ 13,726 (child support—estimated
 because of Leslie's college)
 _____
 $215,136

1990 Figures not available

Average 1986 through 1989: $ 98,463
Average without 1988: $ 131,171

The above figures were presented by *Ronald* and thus likely serve as the lower boundary of his net income over the years in question. Further, they do not fully indicate Ronald's *anticipated* income because (1) he was a salaried lawyer in 1986 and part of 1987, (2) he experienced certain nonrecurring business expenses in 1988 when he became a sole practitioner in Florida, thereby explaining his extraordinarily low income for that year, and (3) he now has his own private practice specializing in personal injury law, which produced significant income in 1989, its first full year of business.

We acknowledge that Ronald's self-employment in his own law firm—specializing in personal injury litigation—complicates matters. Both his self-employment and the nature of personal injury practice may make his income fluctuate unpredictably. Despite these complications, the trial court must evaluate the evidence presented to determine Ronald's net income, thereby complying with section 505(a) of the Act.

We emphasize that tax-reported income does not provide conclusive evidence of either Ronald's gross or net income under the Act, which provides its own guidelines on deductions from business income that reflect different policies and purposes than the Federal tax code. As an example of this difference, Ronald claimed $146,550 on his 1988 tax forms as fee income from his then-solo practice in 1988 (which did not

constitute his only income), but trimmed this income down to $28,156 in personal gross income. Although we do not question that his business deductions were appropriate under the Federal tax code, we doubt that this 81% difference reflected only reasonable and necessary business expenses under section 505(a)(3)(h) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(3)(h)). Even if they did, they would likely constitute one-time expenses he will not incur again soon.

Because Ronald's average net income from the past few years exceeds $67,000, and, more importantly, his anticipated future income most certainly exceeds $67,000, the trial court apparently set his child support payments below the statutory guidelines of section 505(a)(1) of the Act. Although a trial court may deviate from those guidelines in an appropriate case when the court makes express findings as to its reasons for doing so (Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(2)), the only comment of the court on this subject—"The court notes that the amount of child support ordered is *above* the guidelines ***" (emphasis added)—reveals that it thought it was burdening Ronald *in excess* of the statutory guidelines. Accordingly, we conclude that the court's determination of a child support order of less than the guidelines call for is due to the court's miscalculation of Ronald's net income and is not due to any intent of the trial court to impose a child support order under the guidelines.

In a case such as this, the trial court should consider the supporting parent's previous income when trying to determine his prospective income. However, a court should not base its net income finding on the mere possibility of future financial resources (*Harmon*, 210 Ill. App. 3d at 96, 568 N.E.2d at 951) or on outdated data that no longer reflect prospective income. (*In re Marriage of Schroeder* (1991), 215 Ill. App. 3d 156, 161-62, 574 N.E.2d 834, 837-38.) Here, the trial court on remand will have the benefit of being able to consider two more years (1990 and 1991) of Ronald's self-employed income as reflected by his tax forms. See *In re Marriage of Hart* (1990), 194 Ill. App. 3d 839, 850, 551 N.E.2d 737, 744.

Therefore, because Ronald is self-employed, the trial court should start with Ronald's reported gross income from all sources from the years 1989-1991, not his claimed income after he has deducted therefrom sums permitted under the Federal tax code, and deduct from that figure what it deems appropriate under section 505(a)(3)(h) as reasonable and necessary expenses for producing income in determining his net income under the Act. See *In re Marriage of Cornale* (1990), 199 Ill. App. 3d 134, 136-37, 556 N.E.2d 806, 808 (evidence supported trial court's finding that purchasing certain assets constituted reasonable

and necessary expenses for producing income); *Rimkus v. Rimkus* (1990), 199 Ill. App. 3d 903, 909, 557 N.E.2d 638, 642 (in determining net income, nonreimbursable expenses are deductible as long as they are reasonable and necessary to produce income); *Hart*, 194 Ill. App. 3d at 850, 551 N.E.2d at 743 (evidence supported trial court's finding that purchasing certain assets constituted reasonable and necessary expenses for producing income).

In order to avoid an unexplained difference between a supporting parent's large income and an order for child support payments that reflects a smaller income, trial courts ought to expressly state their findings and calculations. (See *In re Marriage of Douglas* (1990), 195 Ill. App. 3d 1053, 1059-60, 552 N.E.2d 1346, 1350 ("Absent such a finding, there is no rational basis upon which we can judge the propriety of the awards").) On remand in this case, we direct the trial court to determine Ronald's gross income, indicate which deductions contained in section 505(a)(3) of the Act apply and which do not, and then calculate the amount of child support he should pay under the statutory guidelines in section 505(a)(1) of the Act. If the trial court decides to deviate from those guidelines, it should specify its reasons for doing so. In making these determinations, the trial court, if it chooses, may receive further evidence relevant to these matters.

### 3. Retroactive Child Support

■ Susan argues that the trial court abused its discretion in not awarding a retroactive increase in child support back to September 1989, when she filed her most recent petition to modify the judgment of dissolution. Section 510(a) of the Act provides that the court may, but need not, grant a retroactive increase in child support under certain circumstances. (Ill. Rev. Stat. 1989, ch. 40, par. 510(a) (trial court "may" modify child support obligation "as to installments accruing subsequent to due notice *** of the filing of the motion for modification").) In the present case, we find no basis on which to conclude the trial court abused its discretion when it denied retroactive support. We note that Ronald caused no delay in the court's hearing Susan's petition to modify child support, and the court did hear that petition in a timely fashion. Further, although Susan had petitioned the court in 1987 and 1988 for an increase in support based on the same allegations in her 1989 petition, she failed to pursue those claims.

### B. *Susan's Share of Referral Fees*

■ Susan next argues that the trial court incorrectly determined her share of Ronald's referral fees for the cases he referred to other

Decatur law firms before he divorced Susan and moved to Florida. The fees from a single case, *Lancaster*, provided the bulk of the outstanding fees. Regarding *Lancaster*, the principal difference between the computations of Ronald's expert and those of Susan's expert arose out of the manner in which they computed the amount of income tax attributable to the *Lancaster* fee, which was therefore deductible before determining Susan's share of the fee. In determining the amount of fees Ronald owed to Susan, the trial court adopted the explanation provided by Ronald's expert and rejected the calculations of Susan's expert, explaining that it "found more persuasive Dr. Langford's testimony as to the proper method of calculating Susan's share of Ronald's referral fees." The trial court described Dr. Langford's method as finding the difference between Ronald's tax obligation with and without the *Lancaster* fee. However, Dr. Langford's figure represents 34.8% of the entire fee minus *no* deductions or expenses. Dr. Langford thus appears to have calculated the amount of tax on the fee as if the entire fee was all net taxable income, without adjustments or deductions.

Moreover, Dr. Langford calculated the taxes on the *Lancaster* fee as $81,301.89, while Ronald only paid a *total* of $55,955 in taxes in 1987. Apparently, Ronald's business deductions reduced his tax liability significantly. However, his business deductions should not effectively *increase* his share of the *Lancaster* fee. Instead, Ronald should receive credit for only the actual income tax he *did* pay on the *Lancaster* fee, not the fictional income tax he *might have* paid without his business deductions. Allowing him to subtract a fictional tax liability furtively increases his share of the *Lancaster* fee in the amount of the difference between the fictional tax and the actual tax. In sum, Ronald did *not* pay $81,301 in taxes on the *Lancaster* fee, and thus should not have received credit for $81,301 as income tax on the fee. Instead, the trial court should subtract the portion of taxes Ronald *actually* paid on *Lancaster*, using one of the methods that Susan's expert employed.

Susan's expert, Wayne Lively, properly calculated the tax on the *Lancaster* fee as *less than* Ronald's 1987 total tax liability. From inspecting the tax form, the *Lancaster* fee constituted the substantial part of his income that year. He declared only $12,490 in gross wages and $259,217 in gross receipts from his business, $233,333 of which came from the *Lancaster* fee. Susan's expert testified that after subtracting income taxes on the referral fees, Ronald owed Susan either $32,628.75 (based on a "pro-rata" method that divides the fee collected by the tax rate used by Ronald that year) or $30,335.94 (using the "highest rate" method, which takes the fee collected, subtracts it from the actual tax return, recalculates the tax without the fee, and then

subtracts the difference in taxes from the fee). Susan's expert calculated that Susan's share amounted to $88,199.79, toward which Ronald had paid only $63,320.00 (leaving a balance of $24,879.79, even though the exhibit at trial labeled the difference as $28,026.23). The calculations by Lively seem far more accurate than those of Dr. Langford.

*Lancaster* seems a model of how Ronald treated other cases, as well. Ronald used this approach of paying the income tax reduced by his deductions and then deducting an incorrect tax amount before paying Susan's share. Because the trial court seemed not to have noticed this problem, on remand the court should reexamine Susan's share of the fees owed in the other cases.

Finally, we note that the trial court reduced Dr. Langford's estimate by over $800. Dr. Langford estimated that Susan's share was $70,849.32, yet the trial court "rounded off" its ultimate award to only $70,000. This matter should be corrected on remand.

## C. *Susan's Contempt Conviction*

In its March 1991 memorandum and in its April 1991 modification order, the trial court found Susan in contempt of court for placing Russell on the plane three days late to visit Ronald. The court found that Susan did this two years in a row (1988 and 1989). The court fined Susan $1,000 for this contempt and offset this amount against the amount the court found that Ronald owed her for her share of the referral fees.

In doing so, the trial court did not follow *In re Marriage of Betts* (1990), 200 Ill. App. 3d 26, 558 N.E.2d 404, which discusses at length the difference between criminal and civil contempt and direct and indirect contempt, as well as the procedural rights that apply to those charged with any form of contempt.

First, *Betts* distinguished between indirect and direct contempt. Indirect contempt differs from direct contempt solely in whether the court must hear testimony proving the contemptuous conduct or instead has directly witnessed the conduct in the courtroom. (*Betts*, 200 Ill. App. 3d at 47, 558 N.E.2d at 418.) The present case involves indirect contempt because Susan's allegedly contemptuous behavior occurred outside of the courtroom.

Second, *Betts* distinguished between criminal and civil contempt. (*Betts*, 200 Ill. App. 3d at 43-47, 558 N.E.2d at 415-18.) Criminal contempt punishes a contemnor for violating a court order, while civil contempt coerces the contemnor to comply with a court order. (*Betts*, 200 Ill. App. 3d at 43-47, 558 N.E.2d at 415-18.) The penalties assessed in criminal contempt cases serve to punish the contemnor for the same

reasons (deterrence, retribution) that other criminal penalties punish a criminal defendant. (*Betts*, 200 Ill. App. 3d at 44, 558 N.E.2d at 416.) On the other hand, the penalties in a civil contempt case serve only to coerce the contemnor to comply with a court order, and they must cease when the contemnor complies. (*Betts*, 200 Ill. App. 3d at 44, 558 N.E.2d at 416.) For instance, a court may imprison or impose a fine that accrues daily until the civil contemnor complies with the court order.

The conduct underlying a civil contempt order may also provide the basis for a separate criminal contempt order so long as the court follows the procedural requirements for both types of contempt. (*Betts*, 200 Ill. App. 3d at 45-46, 558 N.E.2d at 417.) In such a case, the criminal contempt sanctions would retrospectively punish for a prior violation (and deter the contemnor from doing it again), while the civil contempt sanctions would prospectively attempt to coerce the contemnor to comply in the future. *Betts*, 200 Ill. App. 3d at 46, 558 N.E.2d at 417.

In the present case, despite Ronald's "concession" that the trial court found Susan in civil contempt, the court clearly imposed a *criminal* contempt penalty. First, the sanction was punitive and not coercive. Indeed, Ronald's petition did not seek any sanctions to coerce Susan to perform some future act, but rather looked purely *retrospectively* at her prior conduct and requested the court to punish her for it. Second, the court did not condition the penalty on anything she might do in the future (such as putting Russell on the plane on time for future visitations), but rather imposed the fine for what she had *already* done.

As for Susan's procedural rights, the trial court failed to provide Susan with the necessary criminal procedural rights attendant to a charge of indirect criminal contempt. As we clarified in *In re Marriage of Alltop* (1990), 203 Ill. App. 3d 606, 616, 561 N.E.2d 394, 401, civil contempt proceedings should begin with a "petition for rule to show cause" why the court should not hold the respondent in contempt for certain conduct. Primarily because the alleged criminal contemnor enjoys the right to remain silent and the presumption of innocence, he is protected from having to prove his innocence or to show why the court should not hold him in contempt.

Thus, criminal contempt proceedings cannot begin with a "petition for rule to show cause" but instead must begin with a "petition for adjudication of criminal contempt." (*Alltop*, 203 Ill. App. 3d at 616, 561 N.E.2d at 401; see also *Betts*, 200 Ill. App. 3d at 58-59, 558 N.E.2d at 425.) The different labels not only describe the procedure before the

court more correctly, they also notify the respondent if he or she faces *criminal* and not merely *civil* penalties. Although Susan did receive her right to confront the witness against her (Ronald), she received no other procedural rights. The trial court erred by treating the matter as a civil proceeding and by strongly implying that *she* bore the burden of showing why the court should not hold her in contempt. Because Ronald entitled his petition as a "Petition for Rule to Show Cause," she also did not receive notice that she faced *criminal* sanctions. (*Alltop*, 203 Ill. App. 3d at 616, 561 N.E.2d at 401.) For the reasons stated, we reverse the trial court's contempt finding and the fine it imposed.

### D. *Modifying Susan's Maintenance*

#### 1. The Reviewability of Susan's Maintenance Award

In the original 1986 judgment of dissolution, the court awarded Susan $750 per month ($9,000 per year) in maintenance for four years. The judgment did not address the possibility of any later review or extension of the maintenance order. In 1989, Susan filed a petition to extend the maintenance period and increase the amount of maintenance. In its 1991 memorandum decision on that petition, the trial court determined that, "the absence of a reservation of right to review the maintenance award in the [original] Judgment is fatal to [Susan's] petition to extend and increase the maintenance award." Accordingly, the court held that it could not review or extend the four-year maintenance order it entered in 1986. We thus face the issue of whether a court can modify a maintenance order when the order sought to be modified did not expressly reserve the right of the court to review that order at some future time.

Citing *In re Marriage of Albiani* (1987), 159 Ill. App. 3d 519, 512 N.E.2d 30, and *In re Marriage of Asch* (1981), 100 Ill. App. 3d 293, 426 N.E.2d 1066, Ronald argues that the court properly considered the time period of a rehabilitative maintenance award as nonextendable because the court that originally awarded rehabilitative maintenance had already implicitly determined that the maintenance should not extend beyond the rehabilitative period. Accordingly, Ronald argues that if Susan wanted the court to retain jurisdiction to extend the maintenance period, she must have appealed the original order on the ground that the court abused its discretion by not expressly retaining jurisdiction to extend the maintenance period, if warranted.

*Albiani* and *Asch* do not support Ronald's position. Indeed, both cases involve direct appeals of an original dissolution judgment, not an

attempt to later modify it. (*Albiani*, 159 Ill. App. 3d at 522, 512 N.E.2d at 32; *Asch*, 100 Ill. App. 3d at 296, 426 N.E.2d at 1068.) Moreover, in both cases the trial court expressly stated its intention to review the maintenance award at a later date. (*Albiani*, 159 Ill. App. 3d at 522, 512 N.E.2d at 32 (trial court held that "the Petitioner *** shall pay to the Respondent *** the sum of [$750] per month, for a period of twenty-four (24) months, at which time the aforementioned award shall be reviewed by a court of competent jurisdiction"); *Asch*, 100 Ill. App. 3d at 296, 426 N.E.2d at 1068 (court noted that "the maintenance would continue for three years, at which time the court would determine whether respondent had made appropriate and reasonable efforts to procure suitable employment and maintain herself financially").) Indeed, this court has cited *Asch* favorably for the proposition that a trial court can properly retain jurisdiction to review a maintenance award at a later date. See *In re Marriage of Hensley* (1991), 210 Ill. App. 3d 1043, 1050, 569 N.E.2d 1097, 1101.

■ Contrary to Ronald's argument, the Fifth District Appellate Court in *Rice v. Rice* (1988), 173 Ill. App. 3d 1098, 1102, 528 N.E.2d 14, 17, held "that where the trial court has not expressly reserved jurisdiction to extend the term of rehabilitative maintenance, the court retains authority to extend the maintenance beyond the original term *** [as long as] the petition for modification is filed during the period set for rehabilitative maintenance." (See also *In re Marriage of Robinson* (1989), 184 Ill. App. 3d 235, 239-40, 539 N.E.2d 1365, 1367-68 (wherein fifth district recognized the continuing authority of a court to modify a maintenance order in the absence of any express reservation by the court to review that order at some future time).) Because Susan filed her petition to extend maintenance within the period of maintenance set in the 1986 judgment, the trial court could grant her petition if, in its discretion, it thought an extension appropriate.

This result comports with the clear intent of the legislature. Section 510(a) of the Act provides that "the provisions of any judgment respecting maintenance or support *may be modified* only as to installments accruing subsequent to due notice by the moving party of the filing of the motion for modification and only upon a showing of a substantial change in circumstances." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 40, par. 510(a).) The legislature would not have provided for modification of a maintenance order if it intended the original maintenance order to be final and nonmodifiable.

Indeed, by allowing courts to modify maintenance and support orders, the legislature wisely recognized that such orders are *prospective* in effect, and however appropriate they may be when entered, their

continuing appropriateness depends on how accurately they predict the future circumstances of the parties. These prospective orders differ substantially from most other court orders, such as those arising in ordinary tort or contract litigation, because the facts that underlie the court's determination have already occurred. Parties will not be permitted to modify retrospective orders—such as the division of the marital estate at the time of the marital dissolution—because the court has already heard all the evidence the parties presented on the issue the order addresses and rendered a judgment on that evidence—the retrospective order. However, parties can modify prospective orders—such as orders of maintenance and support—because when entering such orders, the court does so by gazing into a cloudy crystal ball and attempting to predict what the future holds for the parties before it. If future circumstances differ from the court's predictions (as manifested by its order), then the parties may petition the court, in compliance with the requirements of section 510 of the Act, to modify its original order to accommodate for the change in circumstances.

We have recently recognized this tacit distinction between retrospective and prospective orders by holding that a trial court possessed the continuing authority to vacate or modify a protective order in the absence of any express reservation by the court to review that order at some future time. (*In re Marriage of Fischer* (1992), 228 Ill. App. 3d 482, 488, 592 N.E.2d 604, 608.) Furthermore, the court in *In re Marriage of Petramale* (1981), 102 Ill. App. 3d 1049, 1053, 430 N.E.2d 569, 573, recognized the inherent jurisdiction of a trial court to modify a child support order without needing to expressly retain jurisdiction to do so. Taken together with *Rice* and *Robinson*, we find these cases as strong authority for our holding in the present case.

The legislature's wisdom of permitting modifications of support orders due to changed circumstances has manifested itself in this case. In 1986 when the court awarded maintenance to Susan, the court considered not only Susan's needs, but also Ronald's ability to pay maintenance based on anticipated income. We can determine what the court in 1986 found Ronald's income to be by again using the child support order and the statutory guidelines for such orders under section 505(a) of the Act (Ill. Rev. Stat. 1985, ch. 40, par. 505(a)). In the original order, the court set Ronald's child support obligation at $750 per month for all three children. According to section 505(a)(1), that figure for support of three children should have represented 32% of Ronald's projected net income. (Ill. Rev. Stat. 1985, ch. 40, par. 505(a)(1).) Based upon the $750 per month (or $9,000 per year) child support obligation—excluding the obligation to provide for health care—the original court thus must

have found that Ronald had a projected net income of approximately $28,125. However, as discussed earlier in this opinion, Ronald has instead consistently earned solid six-figure gross incomes for most of the years since the judgment of dissolution. Even after accounting for the allowable deductions under section 505(a)(3) of the Act and for Ronald's payment of the children's health insurance, the original order grossly underestimated Ronald's projected income. Thus, Susan could, and did, appropriately petition the court for increased maintenance.

Our holding in this case is not the result of an effort to protect the interests only of the supported ex-spouse. To put the matter in Ronald's favor, suppose Susan had won the lottery or had written a best-seller for which she received a million-dollar advance two years after the court rendered its original maintenance order in 1986. Under either circumstance, Ronald would petition the court to vacate the maintenance order regardless of the fact that the original order had set a four-year term of maintenance. Further, the trial court would surely view Ronald's petition favorably because an unexpected turn of events would have rendered the original order of maintenance—no matter how appropriate it was at the time of its entry—unnecessary and inequitable.

■ In addition, Ronald's argument suggests that, in order to retain a petition for a modification of her maintenance award, Susan was required to appeal the original maintenance order on the ground that the trial court abused its discretion by not expressly providing that it retained jurisdiction to review and extend the maintenance award, as did the trial courts in *Albiani* and *Asch*. We disagree. Section 510(a) of the Act gives Susan the right to petition the court to modify its original order of maintenance upon a showing of *a substantial change* of circumstances (Ill. Rev. Stat. 1989, ch. 40, par. 510(a)). Surely she need not appeal the original order just to retain her statutory right to seek a modification of it *if* a substantial change in circumstances occurs. Ronald's argument would require Susan to "perfect" her right to petition for modification before she knows whether she will ever be interested in so petitioning. Such a requirement would waste judicial resources in exchange for no discernible benefit to either party or the judicial system.

### 2. The Substance of Susan's Maintenance Award

In denying Susan's request to extend and increase maintenance, the trial court held the following:

> "[R]egardless of the absence of a reservation of right to review in the Rehabilitation Award in the Judgment of Dissolution of

Marriage, [Susan] failed to fulfill her affirmative duty to acquire sufficient education or training to find employment and become financially independent from the time of entry of the Judgment of Dissolution of Marriage until March 1, 1990. *** [W]hile [Susan] met with some unexpected challenges during the period of Rehabilitative Maintenance, the Court finds that the responsibility for failure to acquire the education or training needed and to find adequate employment rests with her and her alone. The Court further finds that [Susan] has had sufficient means, opportunity, ability, and a reasonable time to obtain gainful employment, training and financial independence during the rehabilitative period of 48 months."

As with awarding child support, awarding and modifying maintenance rests within the sound discretion of the trial court and we will not disturb its judgment absent an abuse of that discretion. (*In re Marriage of Kerber* (1991), 215 Ill. App. 3d 248, 252, 574 N.E.2d 830, 832-33.) "The benchmark for a determination of maintenance is the reasonable needs of a spouse seeking maintenance in view of the standard of living established during the marriage, the duration of the marriage, the ability to become self-supporting, the income-producing property of a spouse, if any, and the value of the nonmarital property." *In re Marriage of Cheger* (1991), 213 Ill. App. 3d 371, 379, 571 N.E.2d 1135, 1140.

The court in 1986 awarded Susan "rehabilitative maintenance," intending thereby to provide Susan with the opportunity to adjust to nonmarital life and to provide herself with independent means of support. (See *Ingrassia v. Ingrassia* (1987), 156 Ill. App. 3d 483, 489, 509 N.E.2d 729, 734.) However, the duty to seek financial independence does not require the party receiving maintenance to liquidate his or her assets in order to achieve that independence. (*Cheger*, 213 Ill. App. 3d at 379-80, 571 N.E.2d at 1141.) Further, the goal of financial independence "must be balanced against a realistic appraisal of the likelihood that the spouse will be able to support herself in some reasonable approximation of the standard of living established during the marriage." (*Cheger*, 213 Ill. App. 3d at 378, 571 N.E.2d at 1140.) Indeed, this court has held that when the facts make it clear that one spouse is *unable* to support herself in the manner in which they lived during the marriage, then it is an abuse of discretion to award *only* rehabilitative maintenance. *Kerber*, 215 Ill. App. 3d at 253, 574 N.E.2d at 833.

In *Kerber*, the former wife had only a high school education, did not work outside the home during the parties' 30-year marriage, and possessed no marketable jobs skills by which she could support herself.

On these facts, this court wrote that "[a] spouse need not be reduced to poverty before maintenance is appropriate" and "a spouse is not required to sell off his or her assets or capital in order to maintain the standard of living established during the marriage." (*Kerber*, 215 Ill. App. 3d at 252, 574 N.E.2d at 832.) Therefore, we held that the trial court abused its discretion by awarding her only rehabilitative maintenance for one year, at which time the court would review the award, instead of permanent maintenance. (*Kerber*, 215 Ill. App. 3d at 253, 574 N.E.2d at 833.) In so holding, the *Kerber* court quoted the following from the special concurrence in *In re Marriage of Hart* (1990), 194 Ill. App. 3d 839, 853, 551 N.E.2d 737, 745 (Steigmann, J., specially concurring):

> " 'Marriage is a partnership, not only morally, but financially. Spouses are coequals, and homemaker services must be recognized as significant when the economic incidents of divorce are determined. [The former homemaker] should not be penalized for having performed [his or] her assignment under the agreed-upon division of labor within the family. It is inequitable upon dissolution to saddle [the former homemaker] with the burden of [his or] her reduced earning potential and to allow [the former wage-earning spouse] to continue in the advantageous position he [or she] reached through their joint efforts.' " *Kerber*, 215 Ill. App. 3d at 253-54, 574 N.E.2d at 833.

The trial court in this case not only erroneously viewed the original maintenance award as nonmodifiable, it also incorrectly viewed the policies underlying maintenance awards by denying Susan's petition to extend and increase her maintenance because she had not found a full-time job in the four years since the judgment of dissolution. The parties in this case have nothing close to equal earning potential, partly as a result of Susan's performing " 'her assignment [as a homemaker] under the agreed-upon division of labor within the family.' " (*Kerber*, 215 Ill. App. 3d at 253-54, 574 N.E.2d at 833, quoting *Hart*, 194 Ill. App. 3d at 853, 551 N.E.2d at 745 (Steigmann, J., specially concurring).) During their 17-year marriage, the parties in this case had agreed that Susan would take care of the home and Ronald would earn the money. Indeed, Susan testified that although she supported Ronald through his final year in law school (the first year of their marriage), Ronald thereafter did not want her to work. Accordingly, she stayed at home to be a homemaker and to raise their children. In so doing, Susan remained out of the work force for 17 years, thereby significantly depreciating her marketability and, perhaps, the workplace skills she formerly possessed.

Viewed in practical terms, Ronald may not have been able to develop his career as successfully as he did without Susan's support in her role as the family's designated homemaker. Viewed in legal terms, their marriage, because of its duration and circumstances, constituted a "moral and financial" partnership in which the interest of each partner can be neither easily ascertained nor easily terminated because of the substantial and continuing effect that partnership has had and will likely continue to have on their lives.

Contrary to our view of the policies underlying maintenance, the trial court viewed the matter as if Susan bore an obligation to find a full-time job to support herself (which *at best* would have provided her with but a fraction of Ronald's income or the income they enjoyed while married), and her failure to do so *precluded* her from receiving *any* extension or increase in her maintenance. In punishing Susan for what the court perceived as her lack of diligence, the court unduly encroached upon Susan's reasonable expectations to be able to live in the future in a fashion remotely resembling how she had been able to live in the past. Susan's expectations in this regard are particularly reasonable in view of Ronald's six-figure income.

The *gross* disparity in Susan and Ronald's potential incomes and the apparently drastic change in Susan's lifestyle support her claim that her maintenance should be extended and increased. Susan likely will never fully regain the career opportunities she lost during her 17-year marriage, yet Ronald still possesses the career skills he cultivated during their marriage to regularly earn a six-figure income. Further, while the trial court may consider Susan's not obtaining a job to support herself, "[e]mployment or potential employment of the spouse seeking [maintenance] is only one factor to consider in determining whether [maintenance] should be awarded, and its duration." (*In re Marriage of Bramson* (1981), 100 Ill. App. 3d 657, 659, 427 N.E.2d 285, 287.) We also note that even Ronald's expert, Dr. Langford, testified that the specific jobs available in Central Illinois to a person with Susan's skills pay a salary ranging only from $14,000 to $19,000 per year. To the extent that the court finds Susan dilatory or even directly at fault for not obtaining suitable employment, the court can offset any potential salary she could have earned from its maintenance award. However, to *completely* deny her any extended or increased maintenance on that basis constitutes an abuse of discretion.

For the reasons stated, we vacate the trial court's denial of Susan's petition to extend and increase her maintenance, and we remand with directions that the trial court consider that petition anew in accordance with the views regarding maintenance expressed herein. Accordingly,

the trial court on remand should consider the nature of Susan and Ronald's moral and financial partnership during the course of their 17-year marriage. *Kerber*, 215 Ill. App. 3d at 253, 574 N.E.2d at 833.

### 3. Evidence of Susan's Lifestyle During the Marriage

At the August 1990 hearing, Susan began to testify about how she supported Ronald through law school but then quit work (save for substitute teaching) because Ronald "never wanted me to work at all." Ronald's attorney objected, stating that "this woman relitigates this divorce every time we have a hearing. We go back into facts and matter[s] which have [already] been litigated with various judges." The court sustained the objection, stating that "I think getting into some employment she may or may not have had during the first year of marriage is too remote, and moreover, [the judge in the original dissolution proceedings] would have considered that evidence in making his ruling for maintenance for four years."

When evidence of Susan's prior lifestyle again arose, Ronald's attorney again objected on the ground that the original judge had considered her prior lifestyle in setting rehabilitative maintenance that was supposed to allow her to readjust. The court sustained the objection as to facts prior to the dissolution judgment, but allowed Susan to testify as to a change in circumstances after that date that would warrant continuing the maintenance beyond the rehabilitative period, thereby temporarily leaving open the issue of whether the court could extend Susan's maintenance. (The court later ruled that it could not.)

■ Because we reverse the trial court's rulings both as to the non-modifiability of the original maintenance order and as to the denial of Susan's petition to extend and increase her maintenance, we conclude that on remand the court should admit testimony on how the parties lived during their marriage. Such testimony would bear directly on the propriety of any extended and increased maintenance, as we discussed earlier in this opinion. Further, such evidence would be relevant to an evaluation of the reasonableness of Susan's expectations about the lifestyle she would have led had no dissolution of marriage occurred, as compared to the lifestyle she will be living without extended or increased maintenance.

### E. *Ronald's Obligation To Provide Susan with His Tax Forms*

■ In its 1991 order responding to the parties' various petitions, the trial court, without explanation, vacated the requirement that Ronald annually furnish Susan with copies of his Federal tax returns. As far as we can tell from the record, the court apparently vacated this

requirement without any party so requesting. Susan argues that the court's action was an abuse of its discretion, and we agree, especially in the absence of any explanation for this action. We therefore instruct the court on remand to reinstate this requirement on Ronald.

### F. *Susan's Motion for Attorney Fees*

In its 1991 order, the trial court expressly denied Susan's request for attorney fees because "each party has sufficient assets or income to pay his or her own attorneys' fees." Susan argues that because she prevailed below (although not to the extent she thinks appropriate) on the issue of her share of Ronald's referral fees, the court should have awarded her attorney fees under section 508(b) of the Act, which makes the award of attorney fees mandatory if the court finds that the failure to comply with the order or judgment was without cause or justification. Ill. Rev. Stat. 1989, ch. 40, par. 508(b).

Ronald responds that the trial court did not find that he violated the court order "without cause or justification," which section 508(b) requires before the court is required to award attorney fees. Ronald is correct on this point, but a court still has discretion to award attorney fees under section 508(a) of the Act when one party lacks sufficient financial resources to obtain or retain legal representation. (Ill. Rev. Stat. 1989, ch. 40, par. 508(a).) A trial court abuses its discretion in not awarding attorney fees under section 508(a) of the Act when the evidence reveals a great disparity in actual earnings and earning capacity. (*In re Marriage of Gable* (1990), 205 Ill. App. 3d 696, 700, 563 N.E.2d 1215, 1217-18; *In re Marriage of Edsey* (1990), 199 Ill. App. 3d 39, 57, 556 N.E.2d 552, 563.) The trial court can award attorney fees when the spouse seeking relief demonstrates (1) financial inability to pay, and (2) the ability of the other spouse to pay. (*Edsey*, 199 Ill. App. 3d at 57, 556 N.E.2d at 563.) Financial inability exists when payment would strip a party of his or her means of support and would undermine his or her economic stability, but it does not require the party to show destitution. *Gable*, 205 Ill. App. 3d at 700, 563 N.E.2d at 1218; *Edsey*, 199 Ill. App. 3d at 57, 556 N.E.2d at 563.

Although the trial court found that both parties have sufficient assets or income to pay their own attorney's fees, the evidence establishes a gross disparity in Susan's and Ronald's actual incomes and income potential, which would warrant the trial court to award such fees. Because this case is being returned to the trial court for further proceedings on other matters, we vacate the court's denial of Susan's request for attorney fees and remand for the court to reconsider whether

Susan deserves a discretionary award for attorney fees under section 508(a) of the Act.

G. *Susan's Right To Visitation During Ronald's Summer Visitation*

 In its memorandum of decision and in its order of modification, the trial court wrote, "During the summer visitation period, [Susan] shall not be entitled to visitation with the minor child except as the parties may agree." Citing *In re Marriage of Bush* (1989), 191 Ill. App. 3d 249, 547 N.E.2d 590, Susan argues on appeal that denying her visitation during the two months Russell visits Ronald in Florida constitutes an abuse of discretion.

By granting Susan visitation conditioned upon the parties agreeing to it, the trial court indicated that Susan should not be denied visitation. However, nothing as important as visitation should be contingent on these two people coming to *any* agreement. In hotly disputed dissolution cases like this, where the parties may have used their children's affection and court petitions as weapons to manipulate and hurt each other, it behooves the trial court to thoroughly and explicitly set forth every duty and right of the parties regarding visitation in order to avoid providing them with grounds for further disputes. To do otherwise invites their inevitable return to court at some future time, asking the court to clarify alleged ambiguities.

For the reasons stated, we reverse the visitation order in question and remand for further proceedings on that matter consistent with the views expressed herein.

### III. Conclusion

For the foregoing reasons, we reverse those portions of the trial court's 1991 order of modification discussed herein and remand for further proceedings consistent with the views and directions contained herein.

Affirmed in part; reversed in part and remanded with directions.

KNECHT, J., concurs.

JUSTICE LUND, dissenting:

I dissent from that portion of the majority decision which reverses the decision of the trial court and provides for modification of the term for rehabilitative maintenance. I also dissent from the majority's reversal of the trial court's determination of the amount owed respondent by petitioner for respondent's share of the *Lancaster* fee. I agree with re-

consideration of the child support, but with specific conditions. I dissent from the order directing the trial court to reconsider its decision, which grants two months' *uninterrupted* visitation with Russell during the summer.

## I. CHILD SUPPORT AND THE GUIDELINES

I concur with remanding the question of child support back to the trial court, but for reasons different than those given by the majority in section I of that opinion. I question the majority's suggestion that petitioner's evidence relating to the 1990 income "most likely does not reflect his actual 1990 income." (232 Ill. App. 3d at 817, 597 N.E.2d at 855.) I would prefer that credibility be left to the fact finder. Another concern I have is with the blind use of gross income figures from 1986 and 1987.

The 1987 tax year included the $233,333 *Lancaster* fee, one-half of which (after taxes) was owned by respondent. Petitioner had no legal right to spend respondent's share. Why should it then be included in determining an average child support? Absent one-half of the fee ($116,667), the gross income in 1987 would be reduced to $55,184. How much of the 1986 gross income was attributable to respondent's 30% share of cases petitioner referred to other firms when he left Illinois?

On reconsidering child support, a careful analysis should be made of earned income from the various years. Funds going to respondent should not be considered part of petitioner's income for purposes of determining his net income to which the child-support guideline should be applied.

Setting the child support will require many determinations by the trial court. I suggest specific findings relating to the determinations, so that if review is required we can have the benefit of the fact finder's reasoning.

## II. THE TRIAL COURT DETERMINATION OF THE *LANCASTER* FEE TAX DEDUCTION SHOULD BE AFFIRMED.

The trial court awarded respondent one-half the *Lancaster* fee after the deduction for taxes. That fee, in the amount of $233,333, was received in 1987, and $63,320 was paid by petitioner to respondent. The problem arises because of the computation of the income tax on respondent's one-half of the fee.

A search of the Internal Revenue Code (26 U.S.C. §1 *et seq.* (1988)) fails to disclose a method by which the taxability of a portion of petitioner's earnings could be transferred to his ex-wife. Several methods of allocation of the tax can be argued—one of which would allow re-

spondent to benefit from petitioner's substantive expense deductions in 1987. This would result in a tax charged to respondent of substantially less than that suggested by petitioner's "expert" and adopted by the trial court.

It appears that an allocation similar to, but not exactly that of petitioner's expert, would be the proper method. Petitioner should have the benefit of any of *his* expenses and deductions which reduced the *taxable income* below the amount of the total *Lancaster* fee. His share of the fee and his other earnings were used to pay the amounts which resulted in reducing the *taxable income*. Respondent's share was not, and could not be, so used. Why should respondent be allowed to benefit from petitioner's payments from his own funds?

My calculation of what *would* have been petitioner's 1987 income tax, if petitioner's *taxable income* had been $233,333, is $83,797. Thus, $41,899 would have been deducted from respondent's $116,667 share. This would result in a tax on respondent's share equal to 35.9%.

Using the 1987 tax rate schedule for a single taxpayer for calculation purposes, the $55,955 tax shown on petitioner's 1987 Federal income tax return would indicate a *taxable income* of $161,016. Respondent's $116,667 is 72.46% of the $161,016; 72.46% of the $55,955 tax is $40,543; and the effective tax rate on respondent's $116,667 is 34.75%. Petitioner's expert, Dr. Langford, came up with a tax attributable to respondent of one-half of $81,301 ($40,651) using a computation somewhat different than mine. Dr. Langford's suggestion was followed by the trial court. The difference between $40,651 and $40,543 is nominal and does not justify reversal. I would affirm the trial court on this issue.

### III. Is The Four-Year Maintenance Term Modifiable?

The original dissolution judgment provided for "rehabilitative" maintenance for a period of four years. There was no provision for subsequent review of the maintenance. I disagree with the majority opinion that the term of this maintenance is subject to modification as held in section III of that opinion, and suggest that the issue of reviewability should have been contested by appealing from the initial judgment of dissolution.

An award of maintenance is within the court's discretion and will not be reversed on appeal unless contrary to the manifest weight of the evidence or an abuse of discretion. (*In re Marriage of Hart* (1990), 194 Ill. App. 3d 839, 851, 551 N.E.2d 737, 744 (Steigmann, J., specially concurring).) Rehabilitative or time-limited maintenance under section 504(b)(2) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 504(b)(2)) is often appropriate. (See *In re Marriage of Hackett* (1986), 113 Ill. 2d 286,

293-94, 497 N.E.2d 1152, 1155; *In re Marriage of Wisniewski* (1982), 107 Ill. App. 3d 711, 719, 437 N.E.2d 1300, 1306-07.) The purpose of such maintenance is to provide incentives for the spouse receiving support to reach self-sufficiency. (*In re Marriage of Carney* (1984), 122 Ill. App. 3d 705, 715, 462 N.E.2d 596, 603.) The maintenance should be terminated, even after a long-term marriage, when the spouse receiving the maintenance has become virtually self-sufficient. (*In re Marriage of Henzler* (1985), 134 Ill. App. 3d 318, 322, 480 N.E.2d 147, 149-50.) However, even if employment exists, the ability to earn sufficient income to provide reasonable needs must be considered. (See *In re Marriage of Ingrassia* (1986), 140 Ill. App. 3d 826, 834-35, 489 N.E.2d 386, 392.) Rehabilitative maintenance came into existence with the passage of the Act (Ill. Rev. Stat. 1979, ch. 40, par. 504(b)). (See also 1 H. Gitlin, Gitlin on Divorce §15.10 (1992).) The concept of marital property as set forth in section 503 of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 503) introduced a new concept into the marriage relationship and gave the nontitle-holding spouse property rights not previously existing. The property allocation became a more significant factor in determining maintenance. 1 H. Gitlin, Gitlin on Divorce §15.10 (1992).

I agree that maintenance limited for a specific time, without a provision for review, is not given favor over permanent maintenance. (See *In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 351-52, 461 N.E.2d 447, 456; see also 1 H. Gitlin, Gitlin on Divorce §15.10, at 334 (1992).) The decisions in *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 464-65, 426 N.E.2d 1087, 1096, and *In re Marriage of Albiani* (1987), 159 Ill. App. 3d 519, 524-25, 512 N.E.2d 30, 32-33, are illustrative of situations where maintenance limited to a time period was improper (long-term marriage, spouse older and not in good health) and where it was proper (spouse given maintenance for 24 months was in good health, age 47, had a degree in education, and received property interest). Our court has recognized the obligation of the maintenance-receiving spouse to use existing skills and the ability to obtain future skills so that employment can be obtained. *In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 634, 450 N.E.2d 1229, 1234.

With that premise, I now turn to my reasons for saying that we should not now modify the four-year term for rehabilitative maintenance. Section 504(b) of the Act specifically states that maintenance "may be in gross or for fixed or indefinite periods of time." (Ill. Rev. Stat. 1991, ch. 40, par. 504(b).) A decree is final for appeal purposes, even though there is a provision reserving the right to review the award of maintenance at some specific time in the future. (*In re Marriage of Cannon* (1986), 112 Ill. 2d 552, 556, 494 N.E.2d 490, 492.) In a

case specifically providing for review, the parties are aware of the possibility of review of the time period when the final dissolution is entered and, if unhappy with the review provision, could then seek appellate relief. When, as here, there is no indication of reviewability of the maintenance time period and a fixed time period is set forth, it would appear that modification was not intended. Because maintenance is determined *in part* by the allocation of property (Ill. Rev. Stat. 1991, ch. 40, par. 504(b)(1)), the party obligated to pay a time-limited maintenance might, because of the limited time maintenance that was awarded, forego appellate review of what may be an unfair property division. Foregoing immediate review of that property allocation bars any future reconsideration of that property allocation. Because the limited term is related to property allocation, that term also should be nonmodifiable after the original dissolution judgment is no longer appealable.

While recognizing that section 510(a) of the Act provides in part that "any judgment respecting maintenance or support *may* be modified" (emphasis added) (Ill. Rev. Stat. 1991, ch. 40, par. 510(a)), I do not conclude that the modification extends to the fixed *term* of rehabilitative maintenance. The wording of section 510 of the Act is general, while that part of section 504(b) of the Act, which states "may be in gross or for fixed or indefinite periods of time" (Ill. Rev. Stat. 1991, ch. 40, par. 504(b)), is specific. Does the majority suggest that maintenance in gross is modifiable because of the language in section 510 of the Act? I would affirm the trial court's refusal to modify the original four-year time frame for maintenance and, in so doing, I am well aware of the *dictum* in *Rice v. Rice* (1988), 173 Ill. App. 3d 1098, 1102, 528 N.E.2d 14, 17, cited by the majority.

IV. Petitioner's Uninterrupted Visitation With Russell.

Section 607(a) of the Act provides, in part, as follows:

"A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral or emotional health." Ill. Rev. Stat. 1989, ch. 40, par. 607(a).

Matters of child custody, including visitation, rest largely in the discretion of the trial court, and that court's decision will not be disturbed unless it is against the manifest weight of the evidence. *In re Marriage of Johnson* (1981), 100 Ill. App. 3d 767, 769-70, 427 N.E.2d 374, 376; *Rodely v. Rodely* (1963), 28 Ill. 2d 347, 350, 192 N.E.2d 347, 349; *Dog-*

*gett v. Doggett* (1977), 51 Ill. App. 3d 868, 871, 366 N.E.2d 985, 987; see generally 1 H. Gitlin, Gitlin on Divorce §14 (1992).

The trial court's opinion in the present case provided petitioner with two months' visitation in Florida—and prohibited respondent's visitation during that period of time unless the parties agreed. Respondent argues our decision in *In re Marriage of Bush* (1989), 191 Ill. App. 3d 249, 264, 547 N.E.2d 590, 598, requires otherwise. I suggest our decision in *Bush* is not applicable to the present facts. The child in *Bush* was born October 10, 1984, and was a child of tender years. The parents lived approximately 50 miles apart. We recently cited *Bush* in our opinion in *In re Marriage of Evans* (1992), 229 Ill. App. 3d 932, where the father had not seen the mentally handicapped 11-year-old child for six years and lives six to seven hours from the financially strapped custodial mother. Here, we have Russell—born January 1981 (11 years of age), evidently of at least average abilities, who has had visitation with his father. The trial court talked with Russell to obtain his thoughts on visitation and the problems between the petitioner and the respondent. I would find that the court's decision granting two months' uninterrupted child visitation with petitioner was not an abuse of discretion and should be affirmed.