NOTICE
Decision filed 10/08/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250187-U

NO. 5-25-0187

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| ZELPHA KREID, | ) | Williamson County. |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 16-D-325 |
| | ) | |
| KALEB KREID, | ) | Honorable |
| | ) | John W. Sanders, |
|     Respondent-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where the circuit court held the respondent in indirect civil contempt for violating the court's parenting plan, and ordered him to pay for and attend private mediation to purge the contempt, the court's order was, in substance, an order for indirect criminal contempt. Therefore, the circuit court abused its discretion in entering its contempt order without affording the respondent his procedural due process rights required in criminal proceedings. Accordingly, we reverse the order of the circuit court.

¶ 2    Respondent, Kaleb Kreid (Kaleb), appeals from the circuit court's denial of his motion to reconsider the court's October 30, 2024, contempt order, as well as the underlying contempt order. On appeal, he argues that the nature of the contempt was criminal rather than civil, and, as such, the court failed to afford him the constitutional protections and procedural rights to which he was entitled as a criminal contemnor. For the following reasons, we reverse.

1

¶ 3                                    I. BACKGROUND

¶ 4     This matter arises from the divorce proceedings between respondent and petitioner, Zelpha

Kreid (Zelpha). The circuit court entered a judgment for dissolution of marriage on May 24, 2017.

On August 17, 2022, the court entered a parenting plan, which designated the parties' post-divorce

parenting time for their minor son, K.K. The terms of the parenting plan that are relevant to this

appeal are as follows:

> "Should the parties not mutually agree to a parenting schedule, the child shall reside primarily with Mother, and she shall be designated as having the child's address for educational purposes. ***
>
>                                     \* \* \*
>
> *** Mother's address shall be the child's residential address for school purposes.
>
>                                     \* \* \*
>
> *** Disputes arising under or involving the Court's Parenting Plan, or, regarding any reallocation of parenting time or parental responsibilities shall be submitted to mediation before any proceeding affecting the terms of this agreement shall be heard by a court without the mutual agreement of both parties. Should the parties be unable to agree through mediation, either party may petition the Court to determine the best interests of the child and make changes to the Court's Parenting Plan accordingly."

¶ 5     On September 26, 2024, Zelpha filed a petition for rule to show cause, asking the court to

find Kaleb in "direct civil contempt"[1] for violating the parenting plan by refusing her parenting

time. Her petition did not include any allegation that respondent changed K.K.'s school enrollment

or otherwise violated the parenting plan as it pertained to his education. The circuit court held a

hearing on October 30, 2024.[2] During his testimony, respondent explained how K.K. came to be

in his physical custody.

---

[1]While this is not at issue on appeal, we note that petitioner should have sought a finding of indirect, rather than direct, contempt, as the alleged conduct took place beyond the courtroom and outside the presence of the circuit court judge. See *In re Marriage of Betts*, 200 Ill. App. 3d 26, 48 (1990).

[2]The court also set a petition for temporary relief filed by respondent for hearing on this date, and the testimony presented at the hearing pertains to both petitions. However, the court's ruling on respondent's petition is not at issue on appeal.

¶ 6 Kaleb testified that his son called him in November 2023 to tell him that he and Zelpha were fighting. The then-11-year-old allegedly asked Kaleb to pick him up from petitioner's home. Although it was not Kaleb's time to have the child, according to the parenting plan, he took K.K. to his residence, where he stayed for approximately a month without seeing Zelpha. During this time, K.K. continued to attend school in the Carterville School District, in the town where Zelpha resided.

¶ 7 Kaleb further explained that he and Zelpha eventually returned to sharing custody of K.K., with the parties communicating with each other through Zelpha's father. However, at the end of the 2023 academic year, Zelpha sent Kaleb a text message about K.K. not using her Carterville address for school anymore. The text was introduced into evidence, and showed that Zelpha told K.K., "He's not going to [Carterville]" and, "Never use my address again." Kaleb testified that for the 2024 academic year, he enrolled their son in the Elverado School District. He alleged that Zelpha was aware of this change and never objected.

¶ 8 Zelpha testified that she had not been made aware of the change in K.K.'s school enrollment and learned about it after the fact. She further stated that she objected to Kaleb moving K.K. out of the Carterville School District. She alleged that she understood her text message to Kaleb to mean that Kaleb would homeschool K.K., but that K.K. would also continue to live with Zelpha and remain enrolled in the Carterville School District.

¶ 9 After hearing the testimony, the circuit court ruled on Zelpha's petition for rule to show cause. The court explained that it heard no evidence that Kaleb denied Zelpha parenting time with K.K., as she alleged in her petition. However, the court went on to find the Kaleb in contempt for the separate reason of violating the parenting plan by making changes to the child's school placement without taking the matter to mediation:

3

"[T]he Court finds the [respondent] in contempt of Court for failure to proceed to mediation prior to changing up a child's schooling and unilaterally changing child's school placement. Nevertheless, at this time, the child is to remain in the school he's currently enrolled [in] until further order of the Court.

\* \* \*

*** The [respondent] may purge his contempt of Court by paying full cost of mediation within 14 days and retainer fee for Guardian *Ad Litem* if an agreement is not reached in mediation."

The court then addressed Kaleb's attorney, and explained to him that Kaleb was to contact the court-ordered mediator and find out her retainer fee, and "get that paid within 14 days so the parties can proceed [to] private mediation" through this mediator. If the parties did not reach an agreement in mediation, the court further told counsel that his client was to pay the guardian *ad litem* fee. Lastly, the court explained that if respondent failed to purge his contempt, he would be subject to paying petitioner $1,000 for reasonable attorney fees.

¶ 10    Kaleb filed a motion to reconsider on November 20, 2024, asserting that the circuit court's finding of purported civil contempt was improper, as the contempt was criminal in nature, and he was not provided the constitutional protections and procedural rights to which a criminal contemnor is entitled. Zelpha filed a response, arguing that the contempt finding was proper because: (1) her petition included a catch-all provision, allowing the court to make a finding on any basis it saw fit; (2) the sanctions were civil in nature because the court imposed a set of conditions on respondent to coerce him to comply with the underlying order; and (3) the contempt would have been criminal if the court had sentenced respondent to jail or imposed a fine upon him for violating its order. Ruling on the pleadings, the circuit court denied respondent's motion on February 5, 2025. This appeal followed.

¶ 11                                II. ANALYSIS

¶ 12    Before addressing respondent's arguments, we note that Zelpha has not filed a response brief in this matter. We find, however, that the record in this case and the issues presented for our

4

review are simple enough to allow us to resolve the claims raised without the aid of an appellee's brief. Thus, we may address those claims. See *First Capitol Mortgage Corp. v. Talandis Construction Co.*, 63 Ill. 2d 128, 133 (1976).

¶ 13    Courts have the inherent authority to impose sanctions for contempt of court, which is necessary to maintain their authority and the administration of their judicial powers. *In re Marriage of Weddigen*, 2015 IL App (4th) 150044, ¶ 19 (citing *People v. Simac*, 161 Ill. 2d 297, 305 (1994)). Contempt proceedings are also a mechanism a court can use to enforce its orders. *In re J.S.*, 2022 IL App (1st) 220083, ¶ 70. Although the power to hold litigants in contempt is "vital to the administration of justice," it is "uniquely susceptible to abuse." *Door Properties, LLC v. Nahlawi*, 2023 IL App (1st) 230012, ¶¶ 26-27. This is because unlike in most areas of law, the legislature does not define the sanctionable conduct or set the penalties available for contempt. *Id.* ¶ 27. Instead, the judge presiding over contempt proceedings has sole discretion in " 'identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct.' " *Id.* (quoting *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 831 (1994)). We remain mindful of this susceptibility in considering whether the court abused its discretion here.

¶ 14    Contempt can be classified as either direct or indirect and as either civil or criminal. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43 (1990). Direct contempt involves conduct that occurs in the presence of the trial judge. *Id.* at 47. Conversely, indirect contempt involves conduct that does not take place in open court and facts of which "the judge does not have full personal knowledge." *Id.* at 48. The distinction between civil and criminal contempt is well established, and hinges on the purpose for which the sanctions were imposed. *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 26.

5

¶ 15    Civil contempt is designed to compel future compliance with the underlying court order, not to punish. *Id.* As such, the contemnor must have the ability to purge himself by complying with the terms of the order. *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 29. Once he achieves compliance, the sanctions must cease. *Id.* Where the contempt is based on past actions that cannot be undone—making compliance with the underlying order impossible—there can be no finding of civil contempt. *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 26.

¶ 16    In summary, civil contempt has two fundamental attributes: "(1) The contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order." *In re Marriage of Betts*, 200 Ill. App. 3d at 44 (citing *People ex rel. Melendez v. Melendez*, 47 Ill. 2d 383, 387 (1971)). If the purge provision of a purported civil contempt order goes beyond the aforementioned limitations, then the contempt order "has unintentionally morphed into an order of *criminal* contempt." (Emphasis in original.) *Door Properties, LLC*, 2023 IL App (1st) 230012, ¶ 38.

¶ 17    By contrast, criminal contempt sanctions "are retrospective in that they are intended to punish the contemnor for past conduct that cannot be undone." *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 30. Instead of coercing compliance with court orders, the rationale for criminal contempt sanctions is "much the same as the rationale for punishing other types of misdemeanor criminal conduct—retribution, deterrence, and vindication of the norms of socially acceptable conduct." *In re Marriage of Betts*, 200 Ill. App. 3d at 44. Whereas civil contempt may be purged through compliance with the underlying order, "a contemnor in criminal contempt is punished without the possibility of relieving themselves of the contempt or punishment." *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 30.

¶ 18    The same conduct may provide the basis for separate findings of civil and criminal contempt. *In re Marriage of Betts*, 200 Ill. App. 3d at 45-46. In such a case, "the criminal contempt sanctions would retrospectively punish for a prior violation (and deter the contemnor from doing it again), while the civil contempt sanctions would prospectively attempt to coerce the contemnor to comply in the future." *In re Marriage of Carpel*, 232 Ill. App. 3d 806, 823 (1992). However, the court imposing these sanctions must follow the procedural requirements of both types of contempt. *Id.*

¶ 19    Where a contemnor is held in criminal contempt, he is entitled to certain constitutional protections and procedural rights, similar to those afforded to a criminal defendant. *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 31. As the *In re Marriage of Pavlovich* court explained, these include:

> "(1) the right to a jury trial when incarceration exceeds six months or the fine exceeds $500; (2) the right to counsel; (3) the right to a change of judge; (4) the right to be charged with a written complaint, petition, or information; (5) the right to personal service and to know the nature of the charges; (6) the right to file an answer and have a public trial; (7) the right to present evidence, subpoena witnesses, and to confront and cross-examine witnesses; (8) the right to be presumed innocent and against self-incrimination; (9) the right to be proven guilty beyond a reasonable doubt; and (10) the right to be admonished as to his constitutional rights." *Id.* (citing *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 31).

A court's failure to provide the criminal contemnor these protections and rights is grounds for vacating the contempt finding. *Id.*

¶ 20    This court has, on various occasions, reversed a circuit court's contempt order where we have found that the nature of the contempt was criminal, rather than civil, and the requisite constitutional protections and procedural rights were not given. We provide some examples that are instructive to our analysis here.

7

¶ 21     In *In re Marriage of Pavlovich*, the trial court found the respondent former wife in indirect civil contempt for violating the marriage dissolution judgment by leasing a condominium for two months before obtaining refinancing. 2019 IL App (1st) 172859, ¶ 32. To purge her contempt, she was ordered to pay the court the amount of money she collected in rent. *Id.* On appeal, we agreed with her argument that this was a criminal contempt finding, because there was "no indication" in the contempt order "that the trial court sought to compel future compliance," and "no method" by which she could "purge herself of contempt by refraining from leasing the condo in the future, which is the very hallmark of civil contempt." *Id.* ¶ 35. We additionally found that "the trial court sought to punish the respondent for an act that could not be undone, that is, an act that was already in the past and could not be corrected," making this criminal contempt. *Id.* ¶ 34.

¶ 22     In *In re Marriage of Carpel*, the trial court similarly found the respondent former wife in indirect civil contempt for violating the marriage dissolution judgment, here for failing to place the parties' son on a flight to visit his father on two occasions. 232 Ill. App. 3d at 822. The court fined her $1,000 for the contempt. *Id.* In determining that the contempt was actually criminal in nature, we found that the sanctions did not coerce her to do any future act, but rather "looked purely *retrospectively* at her prior conduct" and punished her for it. (Emphasis in original.) *Id.* at 823. Furthermore, the court did not condition the penalty on anything she might do in the future, such as placing the child on a flight for future visitation with his father, but instead imposed the fine for what she had already done. *Id.*

¶ 23     Lastly, in *In re Marriage of O'Malley*, the trial court held the respondent former husband in indirect civil contempt for violating the dissolution judgment by failing to sell the marital residence or buy out his ex-wife's share by the deadline imposed by their marital settlement agreement (MSA). 2016 IL App (1st) 151118, ¶ 28. He could purge the contempt upon the ex-

wife's receipt of allocated funds that had been escrowed following the eventual sale of their home. *Id.* ¶ 29. We found that the trial court did not provide the respondent with the opportunity to comply with the MSA, "because that opportunity did not exist once the home was sold." *Id.* ¶ 30. The house had already sold, which meant that the respondent could not possibly comply with the order requiring him to put it up for sale or buy out his ex-wife's share. *Id.* Thus, the sanctions were criminal in nature, because they punished him for his past conduct. *Id.*

¶ 24    In the present case, we find the circuit court's sanctions to be similarly retrospective and punitive. The court found respondent in contempt for violating the parenting plan by unilaterally making a change to his son's schooling plans. As in the abovementioned cases, the act forming the basis for the contempt is something that effectively cannot be undone—just as a residence cannot be unleased or unsold, or a child cannot attend visitation dates that have since passed. Respondent could not go through mediation where he had already enrolled the parties' son in a different school, and the child had been attending that school ever since. Indeed, the circuit court was clear that the child was *not* to be moved from his new school during the pending contempt matter.

¶ 25    Although the circuit court referenced in its ruling the possibility of the parties actually using the mediator's services to resolve their dispute, the conduct that gave rise to the sanctions could not be undone. Furthermore, the circuit court did not provide a way for respondent to purge himself of the contempt that amounted to future compliance with the court's parenting plan. Without more specific instruction on what the parties were to do in mediation, the purge condition effectively amounted to a monetary fine that was based on the amount that respondent should have incurred, had he not committed the contemptuous act—much like the respondent in *In re Marriage of Pavlovich* was required to pay a sum that amounted to her ill-gotten rent earnings. See also *Door Properties, LLC*, 2023 IL App (1st) 230012, ¶¶ 33-36 (finding improper a purge provision that

9

required the contemnor to pay the accumulated daily fines imposed pursuant to an earlier contempt finding regardless of whether he complied with the underlying order).

¶ 26 Additionally, when civil contempt results in a fine, that fine must be paid to the clerk of the court. *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 38; see also *Keuper v. Beechen, Dill & Sperling Builders, Inc.*, 301 Ill. App. 3d 667, 669-70 (1998) (explaining that civil contempt is "not a private remedy" and because civil contempt sanctions are "strictly coercive, the court is without the authority to compensate an aggrieved party for its damages"). Thus, we find that the circuit court's contempt order was criminal in nature.

¶ 27 Having so found, we next address the lack of constitutional protections and procedural rights given to respondent. Because a criminal contemnor enjoys the privilege against self-incrimination, he cannot be required to "show cause," as is generally demanded of him in indirect civil contempt proceedings. See *In re Marriage of Betts*, 200 Ill. App. 3d at 58 (explaining that indirect civil contempt proceedings are commonly initiated by the filing of a petition for rule to show cause, which would effectively violate a criminal contemnor's right not to testify, by placing upon him the burden of proving that he should not held in contempt). Instead, the petitioner files a "petition for adjudication of criminal contempt," and bears the burden of proving her charges beyond a reasonable doubt. *Id.* at 58-59.

¶ 28 Here, the contempt proceedings commenced with petitioner's filing a petition for rule to show cause, resulting in precisely the deprivation discussed above. Furthermore, petitioner only sought a rule to show cause premised on respondent's alleged withholding of parenting time—prior to the hearing, respondent was not on notice that he could be held in contempt for changing the child's school enrollment, or that he could be held in criminal contempt. He was also found to be in contempt of court for violating a provision of the parenting plan that was not referenced in

10

the petition. Additionally, the record shows that the circuit court did not admonish respondent as to his constitutional rights.

¶ 29    As it is clear that the circuit court did not provide respondent all of the constitutional rights and procedural protections afforded to him as a criminal contemnor, we must reverse. See *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 31; see also *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 31.

¶ 30                                    III. CONCLUSION

¶ 31    For the above reasons, we find that the circuit court abused its discretion by finding respondent in indirect criminal content without affording respondent the procedural protections required before imposing criminal sanctions. Accordingly, the judgment of the circuit court is reversed.


¶ 32    Reversed.